AT & T COMMUNICATIONS OF the SOUTHERN STATES, INC., Plaintiff,

v.

BELLSOUTH TELECOMMUNICATIONS, INC., et al., Defendants.

No. 4:97cv262–RH.

United States District Court, N.D. Florida, Tallahassee Division.

Sept. 28, 2000.

Marsha Ellen Rule, AT & T, Tallahassee, FL, David L. Lawson, Sidley & Austin, Washington, DC, Mark K. Logan, Smith Ballard Logan PA, Tallahassee, FL, Paul Race Bradshaw, Paul R. Bradshaw PA, Tallahassee, FL, for AT & T Communications of the Southern States, Inc.

Wesley Robert Parsons, Adorno & Zeder PA, Miami, FL, William Wallace Deem, Mahoney Adams & Criser, Jacksonville, FL, Sean A. Lev, Michael Kellogg, Kellogg Huber Hansen, Washington, DC, for BellSouth Telecommunications Inc.

David E. Smith, Public Service Commission, State of Florida, Tallahassee, FL, for Commissioners of Florida Public Service Com'n.

### ORDER ON MERITS

HINKLE, District Judge.

These consolidated actions present a challenge under the Telecommunications Act of 1996, 47 U.S.C. §§ 251–52, to a decision of the Florida Public Service Commission with respect to the terms and conditions under which the defendant incumbent local exchange carrier must provide services and make facilities and network elements available to the plaintiff competitor. I uphold the Florida Commission's basic pricing methodology but vacate its decision in certain respects for further explanation or consideration.

### Background—The Statutory Framework

Historically, local telephone service was provided in the United States on a monopoly basis by carriers regulated under state law by state public service commissions. Congress fundamentally changed that approach by enacting the Telecommunications Act of 1996. The Act imposes on local carriers, as a matter of federal law, various duties designed to foster competition. The Act allows state commissions the option of taking a major role in implementing the Act's requirements.

The federal duties imposed on each "incumbent local exchange carrier"—that is, on each carrier who previously provided local service on a monopoly basis—include the obligation to sell local services at wholesale to any competing carrier for resale by the competing carrier to customers, the obligation to allow competitors to interconnect with the incumbent's facilities for the purpose of providing services to the competitor's own customers, and the obligation to make certain "network elements"—parts of its telecommunications system—available to competing carriers for their use in providing service to their own customers. These duties are described in greater detail in *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.*, 2000 WL 1239840 (N.D.Fla.2000).

The Act also imposes on each incumbent the duty to negotiate ·in good faith with any requesting carrier on the terms and conditions of an agreement under which these various duties will be fulfilled. *See* 47 U.S.C. § 251(c)(1). The Act likewise imposes on requesting carriers the duty to negotiate in good faith. *Id.*

If the parties reach a negotiated agreement, it must be submitted to the state commission for approval. *See* 47 U.S.C.

§ 252(e)(1). If the parties fail to agree on all terms and conditions, any party to the negotiation may request binding arbitration before the state commission of "any open issues." 47 U.S.C. § 252(b)(1).[1]

The Act provides for judicial review of the commission's decisions in federal district court. *See* 47 U.S.C. § 252(e)(6). The case at bar is an action for judicial review under this provision.

### *Background—The Case at Bar*

■ Defendant BellSouth Telecommunications, Inc. ("BellSouth") is the incumbent local exchange carrier in parts of the State of Florida. Plaintiff AT & T Communications of the Southern States, Inc. ("AT & T") is a competitor. In accordance with the Telecommunications Act of 1996, BellSouth and AT & T entered negotiations for an agreement under which AT & T would purchase certain services for resale, would interconnect with BellSouth's facilities, and would have access to BellSouth's network elements. They were unable to agree on all terms and conditions of an agreement and thus sought and obtained arbitration before the Florida Public Service Commission. Following an evidentiary hearing, the Florida Commission issued a final arbitration order and, in due course, an order on reconsideration. AT & T now brings this action challenging the Florida Commission's decision in certain respects, and BellSouth counterclaims challenging the decision in another respect. AT & T has named as additional defendants the Commissioners of the Florida Public Service Commission, in their official capacities.[2]

More specifically, AT & T challenges the overall pricing methodology employed by the Florida Commission to set the rates for network elements; the imposition of an allegedly excessive "per message" charge for the local switching network element; the use of statewide averaged rates for the local loop network element rather than deaveraged rates reflecting geographic disparities in actual costs; and the adoption of wholesale rates for services sold to AT & T for resale that fail to eliminate costs of operator services provided by BellSouth to retail customers but not ordered by AT & T. In its counterclaim, BellSouth challenges the Florida Commission's treatment of the combining of network elements for sale as complete service. This order addresses these five issues in turn.[3]

The parties have agreed that this court's review should be conducted based solely on the record as compiled in the Florida Commission. The parties have submitted briefs and presented oral argument, and more recently have submitted supplemental briefs addressing the decision of the United States Supreme Court in *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). This order constitutes the court's ruling on the merits.

I uphold the Florida Commission's overall pricing methodology. I conclude that the Florida Commission must further explain or reconsider the per message charge. I uphold the decision to use statewide averaged rates for local loops on a

---

**1.** If the state commission chooses not to act on either a negotiated agreement or request for arbitration, the Federal Communications Commission must assume the responsibilities of the state commission. *See* 47 U.S.C. § 252(e)(5).

**2.** Such an action for judicial review of a state commission's decision may proceed against the individual commissioners in their official capacities in accordance with *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and thus is not barred by the Eleventh

Amendment. *See MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.*, 1997 WL 1133453 (N.D.Fla.1997).

**3.** AT & T initially also raised an issue concerning terminating switched access charges. The Florida Commission asserted it had not addressed that issue and that the issue was not properly before the court. AT & T has explicitly withdrawn this issue from those it seeks to present in this action. (Document 78.)

temporary basis but require further consideration regarding the relationship of that decision to the May 1, 2000, effective date of a Federal Communications Commission regulation requiring deaveraging. I disapprove the Florida Commission's failure to deduct from wholesale rates the avoided costs of operator services. Finally, I conclude that the Florida Commission must reconsider its treatment of the combining of network elements in light of intervening developments.

### Standard of Review

The Telecommunications Act provides for actions such as the case at bar in a single sentence:

> In any case in which a State commission makes a determination under [the Act], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of [the Act].

47 U.S.C. § 252(e)(6).[4] The Act does not further specify the standard of review to be applied in determining "whether the agreement ... meets the requirements of" the Act.

■ For the reasons set forth at length in *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.,* 112 F.Supp.2d 1286 (N.D.Fla.2000), I will review *de novo* issues regarding the meaning and import of the Telecommunications Act, and I will review state commission determinations of how to implement the Act as so construed only under the arbitrary and capricious standard. This apparently is the standard of review advocated by all parties to this proceeding.

### Merits

I addressed two of the issues presented by the case at bar in *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.,* 112

F.Supp.2d 1286 (N.D.Fla.2000). That action was a challenge to the Florida Commission's rulings on issues presented for arbitration by BellSouth and a different competitor, MCI. I disapproved the Florida Commission's decision on the issue of general pricing methodology and upheld the decision with respect to the combining of network elements. The ruling was based on then-controlling regulations of the Federal Communications Commission. Had the law not changed, in the case at bar I would simply follow my *MCI* decision on these issues.

But the law has changed. The FCC regulations I relied on in *MCI* have been invalidated by a controlling decision of the United States Court of Appeals for the Eighth Circuit, which has exclusive jurisdiction to determine the validity of those regulations, subject only to discretionary review by the United States Supreme Court. *See* 28 U.S.C. § 2342. This development underscores the accuracy (and perhaps too-prophetic nature) of the statement I made in *MCI:*

> The rapidly evolving judicial, administrative and technological developments in the telecommunications field render the task of the Florida Commission (and this court on review) somewhat akin to shooting at a moving target, one whose movements are neither constant nor predictable.

*MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.,* 112 F.Supp.2d 1286, 1293 at n. 10 (N.D.Fla.2000). My decision in *MCI* is now on appeal to the United States Court of Appeals for the Eleventh Circuit, where it presumably will be reversed in relevant part, based on the Eighth Circuit's ruling, unless the Eighth Circuit reconsiders its ruling or the Supreme Court grants certiorari and the target moves again.

---

4. The "agreement" to which this provision applies is an interconnection agreement of the type here at issue. The "statement" to which this provision applies is a statement of a Bell operating company of generally available terms under *See* 47 U.S.C. § 252(f). No such statement is involved here.

So that there will be a clear record of the movement of the target and its current location as this order is issued, I recount the chronology. On August 8, 1996, the FCC issued its First Report and Order, announcing regulations on some of the topics now at issue. *See* First Report and Order, In the Matter of Implementation of Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499 (1996). On September 27, 1996, the Eighth Circuit stayed some of the regulations; this was prior to their proposed effective date. On various dates between December 31, 1996 and June 19, 1997, while the stay was in place, the Florida Commission entered the orders now under review in the case at bar, following FCC regulations that had not been stayed but exercising its own independent judgment on issues addressed by FCC regulations that had been stayed. On July 18, 1997, the Eighth Circuit issued its decision invalidating certain of the FCC's regulations. *See Iowa Utilities Bd. v. FCC,* 120 F.3d 753, 800 (8th Cir.1997). On January 26, 1998, the United States Supreme Court granted certiorari. I delayed any ruling pending issuance of the Supreme Court's decision. On January 25, 1999, the Supreme Court reversed the Eighth Circuit in certain respects and remanded for further proceedings, thus leaving the FCC regulations now at issue in effect, pending further consideration by the Eighth Circuit. *See AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The parties requested and were granted leave to submit supplemental briefs in the case at bar addressing the Supreme Court's decision. On June 6, 2000, I issued my ruling in *MCI,* treating the relevant FCC regulations as binding; as of that date, they stood neither stayed nor invalidated. On July 18, 2000, the Eighth Circuit issued its opinion on remand, again invalidating some of the FCC regulations. *See Iowa Utilities Bd. v. FCC,* 219 F.3d 744 (8th Cir.2000). At this writing, this most re-

cent Eighth Circuit decision is the controlling law.

This order addresses the Florida Commission decision as appropriate in light of these developments.

## I. *PRICING METHODOLOGY*

■ The Telecommunications Act directs state commissions to set "just and reasonable" prices for interconnection and network elements "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element." 47 U.S.C. § 252(d)(1). All parties to this action apparently agree that this means prices must be based on the cost that reasonably would be incurred to provide the service or network element at issue prospectively, not the cost that may have been incurred historically but would not reasonably be incurred to provide the service or network element prospectively. As the parties have said, prices must be based on "forward-looking," not historical, cost.

The parties disagree, however, on the proper method of calculating "forward-looking" cost. AT & T advocates the use of Total Element Long–Run Incremental Cost ("TELRIC"), the methodology mandated by FCC regulations. *See* 47 C.F.R. §§ 51.505, 51.511. The Florida Commission addressed the matter independently, without regard to the FCC regulations, which had been stayed when the Florida Commission acted and now stand invalidated by the Eighth Circuit. *See Iowa Utilities Bd. v. FCC,* 219 F.3d 744 (8th Cir. 2000). The Florida Commission adopted a different methodology known as Total Service Long Run Incremental Cost ("TSLRIC").

The essential difference between the FCC's "TELRIC" method and the Florida Commission's "TSLRIC" method lies in their treatment of the existing network structure of the incumbent local exchange carrier at issue. While the Florida Commission's version of TSLRIC uses the

*current network architecture* and future replacement technology as the basis for determining long-run incremental cost, TELRIC assumes only that the existing wire centers are in place and then builds a *hypothetical, efficient network* around them. *See* 47 C.F.R. §§ 51.503, 51.505.

In *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.,* 2000 WL 1239840 (N.D.Fla.2000), after describing these different positions of the Florida Commission and FCC, I concluded:

> Reasonable arguments can be made either way. Congress has not definitively resolved the issue. This is, therefore, an issue on which the appropriate administrative agency's adoption of either methodology would survive judicial review under the applicable arbitrary and capricious standard.

*MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.,* 112 F.Supp.2d 1286, 1292 (N.D.Fla.2000). I concluded that the FCC's view, not the Florida Commission's, must prevail, because, as of that time, the FCC's regulations had not been invalidated by the only court with jurisdiction to review them—the Eighth Circuit—and thus were the law of the land.

Now, as set forth above, the Eighth Circuit has invalidated the FCC regulations. On the Eighth Circuit's now-controlling view, the FCC's TELRIC methodology contravenes the plain language of the Act. This does not undermine, but instead further supports, my conclusion as set forth in *MCI* that the Florida Commission's TSLRIC approach is an acceptable administrative interpretation of the Act that would survive review under the arbitrary and capricious standard. But for the

FCC's regulations, I would have upheld the Florida Commission's decision from the outset. AT & T's challenge to the Florida Commission's adoption of the TSLRIC methodology thus will be rejected.[5]

## II. PER MESSAGE CHARGES

AT & T next contends that the Florida Commission erred by imposing a "per message" charge as part of the initial minute local switching network element charge. (Complaint, ¶ 38). Included in the rates for network elements which were approved by the Florida Commission was an initial minute fee for end office switching of $.0175, whereas the fee for additional minutes was set at $.005. (Arbitration Order, Attachment A, at 114). This in effect imposed a $.0125 per message charge.

The specific rates for network elements adopted by the Florida Commission, including this initial minute fee for end office switching, were designed to cover "BellSouth's TSLRIC costs and provide some contribution toward joint and common costs." (Arbitration Order at 33). The Florida Commission made no effort to explain specifically the reason for the per message charge or the level at which it was set.

AT & T challenges the per-message charge based in part on the use of the TSLRIC methodology. As set forth above, however, the Florida Commission's adoption of TSLRIC was unobjectionable.

AT & T's remaining challenge is a disagreement with the appropriateness of any per-message charge over and above a time-based usage charge and, even if a

---

5. The Eighth Circuit's ruling is binding to the extent it invalidates the FCC regulations. Technically, this leaves the situation as if the FCC had adopted no regulations at all. When reviewing a Florida Commission decision under the Telecommunications Act of 1996 in the absence of FCC regulations, an opinion of the Eighth Circuit ordinarily would *not* be binding. Whether an Eighth Circuit decision should be deemed binding in these circum-

stances—after invalidation of an FCC regulation by the Eighth Circuit, during resulting review of a Florida Commission decision in the absence of any valid FCC regulation—is a nice question that need not be addressed here. My conclusion, whether the Eighth Circuit's decision is deemed binding on this issue or not, is that the Florida Commission's TSLRIC methodology does not violate the Act and is not arbitrary and capricious.

per-message charge is deemed appropriate, with the amount of the charge imposed by the Florida Commission. In response, BellSouth and the Florida Commission assert that AT & T failed properly to raise this issue before the Commission. BellSouth makes no argument on the merits in support of the charge, and the Florida Commission addresses the merits only in passing.

The assertion that AT & T did not properly raise this issue before the Florida Commission is incorrect. AT & T proposed rates reflecting no per message charge. AT & T objected to BellSouth's rates, including the per message charge, in part on the grounds that BellSouth had provided insufficient cost information in support of its proposed rates. As an example of the insufficiency of BellSouth's data, AT & T specifically cited the per-message charge. When the Florida Commission sided with BellSouth, AT & T challenged the ruling by motion for reconsideration, and AT & T supported its motion in part by filing testimony from a BellSouth official in another state apparently acknowledging that there was no cost-based reason for imposing a per-message charge. In short, AT & T unsuccessfully proposed rates with no per-message charge, challenged BellSouth's proposed rates including the per-message charge, specifically raised the per-message issue on reconsideration, and has never, in any way, acquiesced in the substantial per-message charge adopted by the Florida Commission.

On the merits, the Florida Commission has provided insufficient explanation for its decision to allow meaningful review. The appropriate course thus is to direct the defendant Commissioners to explain or further consider their decision. *See, e.g., Checkosky v. SEC,* 23 F.3d 452, 462–63 (D.C.Cir.1994) (remanding insufficiently explained administrative decision "so as to afford the agency an opportunity to set forth its view in a manner that would permit reasoned judicial review"; so hold-

ing even in the absence of any conclusion that the agency acted arbitrarily or capriciously); *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (recognizing that "courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review").

This conclusion draws support not only from the Florida Commission's failure fully to explain its decision but also from the potential importance of this type decision to the effective implementation of the Telecommunications Act of 1996. Under the Act, an incumbent must provide to any requesting carrier nondiscriminatory access to "network elements" on an unbundled basis, on "rates, terms and conditions that are just, reasonable, and nondiscriminatory," 47 U.S.C. § 251(c)(3), at least when access to such network elements is "necessary" (in the case of proprietary network elements) or when failure to provide such access would "impair" the requesting carrier's ability to provide services (in the case of non-proprietary network elements). *See* 47 U.S.C. § 251(d)(2). The "just, reasonable and nondiscriminatory" rates for network elements must be "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the ... network element." 47 U.S.C. § 252(d)(1).

Congress imposed these standards because, if an incumbent's rate for a network element is set unreasonably high, the duty to provide access to that network element may, as a practical matter, become meaningless. AT & T is clearly correct that a sufficiently inflated per-message charge could be adopted by a state commission to undermine the requirements of the Act.

 This is, therefore, an issue on which review in this court is properly available, albeit under the arbitrary and capricious standard. A state commission's decision regarding pricing levels is entitled to substantial deference, but it is not entitled to blind obeisance. Because of the appropriateness of meaningful review on

this issue, a state commission must explain the exercise of its discretion in sufficient detail to allow a reviewing court to confirm that the commission in fact exercised its discretion on this issue and did so for legitimate reasons, not for the purpose or with the effect of undermining the network element provisions of the Act.

■ As this matter now stands, I cannot say that the Florida Commission based the per-message charge on cost (as required by the Act) or that, as a matter of administrative judgment based on the evidence of record, it properly found the per-message charge to be "just, reasonable and nondiscriminatory." The defendant Commissioners thus will be directed to explain or reconsider their decision on this issue.

## III. GEOGRAPHIC DEAVERAGING

■ The cost of providing local telecommunications service is higher in some places than in others. Thus, for example, it apparently is accepted—and the parties in this case seem to acknowledge—that the cost of providing a local loop to a business in a densely populated urban area is less than the corresponding cost of providing a loop to a residence in a sparsely populated rural area.

Historically, however, incumbent local exchange carriers have charged retail customers geographically averaged rates, at least to some extent. This generally has been done at the insistence of state commissions, with the acknowledged goal of promoting universal service.

AT & T asserts that under the Telecommunications Act of 1996, incumbents should not be allowed to charge competitors statewide averaged rates for local loops, but should instead be required to charge only deaveraged rates. AT & T correctly notes that under the Act, prices for network elements must be based on "cost," *see* 47 U.S.C. § 252(d)(1)(A)(i), and AT & T asserts this means the cost of providing the element at issue in the location at issue, not the cost of providing the same element somewhere else.

For its part, BellSouth does not contest the use of deaveraged rates as a philosophical matter. BellSouth does say, however, that it would be improper to hold Bell-South to averaged rates for retail sales to its own customers while requiring it to sell local loops to competitors at deaveraged rates. This, BellSouth says, would allow competitors to attract BellSouth's customers not because of greater skill, foresight or industry, but simply because of regulatory distortions.

This is an issue on which there is no bright line solution mandated by the Telecommunications Act. It is, instead, an issue on which considerable administrative discretion should (and indeed must) be brought to bear. This is so for at least two reasons.

First, all rates are "averaged" to some extent. The art of cost accounting is not sufficiently refined to allow a determination of the actual cost of providing each specific loop, separate and apart from the loop next door or down the street. And even if the specific cost of each specific loop could be determined, the cost of determining the cost probably would exceed the cost. A system that set rates based on the cost of each specific loop, without any averaging, would not work. The issue, then, is not whether rates will be based on averaged costs; they will. The issue is only how many loops (and which ones) will be included in the pool used to calculate the average. The Florida Commission included every BellSouth loop in the pool, whereas AT & T says there should have been two or more pools, thus allowing at least some geographic differentiation.

Second, BellSouth's concern about regulatory distortions is hardly frivolous. The long-term solution-and the solution that the Act may eventually produce-is to allow incumbents to compete in the market, free of regulatory requirements that in effect force them to charge above-competitive prices to their best customers. The Act

provides an alternative mechanism for pursuing universal service intended to end the need for the pricing scheme historically used to achieve that goal. *See* 47 U.S.C. § 254. That does not necessarily mean, however, that deaveraging must occur immediately. The transition from the old approach to the new is an area particularly appropriate for the exercise of administrative judgment.

The adoption of statewide averaged rates throughout Florida on a permanent basis would raise substantial questions under the Telecommunications Act (even in the absence of any FCC rule requiring deaveraging). On a transitional basis, however, especially when considered in light of the evidence available in the record that was before the Florida Commission, its adoption of statewide averaged rates did not violate the Act and was not arbitrary and capricious. The Florida Commission's action was, instead, within the range of administrative discretion permissible under the Act.

Nonetheless, the deaveraging target has continued to move. This is one of the issues addressed in the rules that were promulgated by the FCC but then stayed and eventually vacated by the Eighth Circuit based on the jurisdictional holding that was reversed by the Supreme Court. *See AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The FCC rule requires each state commission to establish rates for at least three geographic areas:

> State commissions shall establish different rates for elements in at least three defined geographic areas within the state to reflect geographic cost differences.

47 C.F.R. § 51.507(f). The Supreme Court's decision confirmed the FCC's jurisdiction in this area, and the rule has not been invalidated.

More recently, however, the FCC stayed its own rule, recognizing the need to allow states time to implement deaveraging. *See* Implementation of the Local Competi-

tion Provisions of the Telecommunications Act of 1996; Deaveraged Rate Zones for Unbundled Network Elements, 64 F.R. 32206 (June 16, 1999). The FCC lifted the stay effective May 1, 2000. *See* Implementation of the Local Competition Provisions of the Telecommunications Act of 1996; Deaveraged Rate Zones for Unbundled Network Elements, 64 F.R. 68637 (December 8, 1999).

The FCC's rule, and its delayed implementation, are valid applications of the Act. Thus, as of May 1, 2000, state commissions became obligated to deaverage rates over at least three geographic areas.

Because of the passage of time (based in part on the administrative and judicial ebb and flow), it is unclear whether the Florida Commission's decision now under review will continue to have effects inconsistent with 47 C.F.R. § 51.507(f). The defendant Florida Commissioners thus will be directed to reconsider their decision to assure that it does not produce results inconsistent with that rule.

## IV. *OPERATOR SERVICES COSTS*

■ Another method by which the Telecommunications Act of 1996 allows new entrants to compete is by buying services from incumbents for resale to the new entrant's own customers. Thus the Act imposes on incumbents the duty

> to offer for resale at wholesale rates any telecommunications service *that the [incumbent] provides at retail* to subscribers who are not telecommunications carriers....

47 U.S.C. § 251(c)(4) (emphasis added). If the parties fail to reach a negotiated agreement on the wholesale rates that the incumbent will charge the competitor for such services, the Act requires state commissions to determine wholesale rates

> on the basis of retail rates charge[d] to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing,

billing, collection, *and other costs that will be avoided by the [incumbent].* 47 U.S.C. § 252(d)(3) (emphasis added).

AT & T seeks to obtain local service from BellSouth for resale. AT & T chooses, however, not to order BellSouth's operator services; AT & T will provide its own operator services. AT & T asserts that the wholesale price charged by BellSouth to AT & T should be reduced by the cost that BellSouth avoids by providing operator services. BellSouth asserts, however, that AT & T is entitled to buy at wholesale only the same service BellSouth sells to its customers who are not telecommunications carriers, that is, local service with operator services included. BellSouth says it does not sell, to its non-carrier subscribers, local service without operator service, that it thus would have no obligation under the Act to sell local service without operators to AT & T, and that it thus has no obligation to eliminate any cost of operator service from the wholesale rates charged to AT & T.

For two reasons, BellSouth is wrong. First, under a valid FCC rule, BellSouth must provide local service to AT & T for resale and simultaneously must provide customized routing by which customers reach AT & T operators, so long as that is technically feasible. *See* 47 C.F.R. § 51.319(c)(1)(iii)(B); First Report and Order, In the Matter of Implementation of Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499 at ¶ 536 (1996). This is the functional equivalent of requiring BellSouth to provide AT & T local service without operator services.

Second, even if there were no such rule, the result would be the same. Beyond any question, BellSouth provides local service to subscribers at retail. That is the service AT & T seeks to obtain at wholesale. The Act squarely recognizes that a competitor need not take the entire package, including all attributes provided by the incumbent to non-carrier subscribers; the Act explicitly identifies billing services, for example, as a service whose cost properly can be excluded from the wholesale rate charged to a competitor. BellSouth provides billing services to every subscriber, just as it provides operator services to every subscriber, and AT & T is entitled to obtain local service without receiving or paying for operator services, just as AT & T is entitled to obtain local service without receiving or paying for billing services.

To be sure, billing services, on the one hand, and operator services, on the other, are services of a somewhat different sort. But both are services that are collateral to the real object of the endeavor, which is the provision of local telephone service. Both are features that a reseller might reasonably choose to provide for itself, at least in part because of their value in marketing the local service to which they are collateral. The purposes of the Telecommunications Act of 1996 are best served by allowing competitors to obtain for resale the incumbent's local service while allowing the competitors to provide their own billing and their own operator services if they so choose.

When AT & T obtains local service from BellSouth for resale but does not use BellSouth's operator services, BellSouth avoids some cost. BellSouth does not seem to assert the contrary, and any such assertion would make no sense. The incremental cost of providing operator services to customers at the margin may be small, but cost there is.

There is no justification for attempting to pass on to AT & T a cost that is in fact avoided. Thus, as a matter of logic and simple fairness, any such avoided cost should be excluded from the wholesale rates charged to AT & T. Congress clearly recognized this; just as it expressly provided that billing costs would be excluded from wholesale rates, it also required the exclusion of "other costs that will be avoided" by the incumbent.

The Florida Commission thus erred when it refused to reduce the wholesale

rates charged to AT & T by the amount of costs actually avoided by BellSouth in the provision of local service for resale. The defendant Commissioners will be directed to reconsider this issue.[6]

## V. COMBINING UNBUNDLED NETWORK ELEMENTS

In its counterclaim, BellSouth asserts that the Florida Commission improperly required BellSouth to provide AT & T with "recombined" unbundled network elements, thus in effect allowing AT & T to purchase complete service from BellSouth not at the wholesale price properly charged in connection with the sale of complete service for resale, but instead at the substantially lower price determined by adding up the prices of the various unbundled network elements that, when combined, constitute complete service. BellSouth asserts this "sham unbundling" violates the Telecommunications Act.

BellSouth's principal assertion, both before the Florida Commission and in its initial brief in this court, addressed pricing. BellSouth's contention was that AT & T should not be allowed to obtain complete service at a price below the wholesale price of complete service; BellSouth asserted that by obtaining complete service at the aggregate price of combined network elements, AT & T would be "gaming the system."

■ On this, BellSouth was and is wrong. The Act obligates an incumbent both to sell complete service to competitors at wholesale and to provide competitors network elements at rates based on cost (to the extent required under the "necessary" and "impair" standards). These are separate methods by which a competitor may compete, and the choice of which method to use under what circumstances lies with the competitor. The Act does not preclude a competitor from combining network elements into complete service, nor does the Act require a competitor who does so to pay the wholesale price of combined service rather than the aggregated price of the network elements. These conclusions are fully consistent with the Act itself, the *Iowa Utilities* decisions of the Supreme Court and of the Eighth Circuit on remand, and all regulations of the FCC.

BellSouth now also asserts that the Florida Commission erred by requiring BellSouth itself to combine separate network elements ordered by AT & T rather than requiring AT & T to do any such combining. Although the Florida Commission did not specifically address this issue, it did cite and expressly rely on the FCC's rule requiring precisely that result. The rule provides:

> Upon request, an incumbent LEC shall perform the functions necessary to combine unbundled network elements in any manner, even if those elements are not ordinarily combined in the incumbent LEC's network, provided that such combination is:
>
> (1) Technically feasible; and
>
> (2) Would not impair the ability of other carriers to obtain access to unbundled network elements or to interconnect with the incumbent LEC's network.

47 C.F.R. § 51.315(c).

The Florida Commission asserts that in the order now under review, it did not address the issue of whether BellSouth must do the combining of network elements. BellSouth surely cannot be faulted, however, for raising the issue here; the Florida Commission's order, when combined with its explicit reliance on § 315(c), reasonably could be interpreted

---

**6.** Although by rule the FCC originally required the exclusion not only of costs that "will be avoided" but also costs that "can be avoided." 47 C.F.R. § 51.609(b), the Eighth Circuit now has invalidated that rule, squarely holding that only actually avoided costs must be excluded from wholesale rates. *See Iowa Utilities Bd. v. FCC,* 219 F.3d 744, 755 (8th Cir.2000). The Florida Commission must exclude from the wholesale rates charged to AT & T only operator service costs that are actually avoided by BellSouth.

as imposing such a requirement. And while this was not the focus of BellSouth's arguments before the Florida Commission or in its initial brief here, BellSouth did squarely and resolutely challenge the entire concept of requiring it to provide these services in this manner.

The FCC rule on which the Florida Commission relied—47 C.F.R. § 51.315(c)—now has been invalidated by the Eighth Circuit, in its order on remand. *See Iowa Utilities Bd. v. FCC,* 219 F.3d 744, 759 (8th Cir.2000). Because the Florida Commission made its decision in reliance on the now-invalidated rule, the appropriate course is to direct the defendant Commissioners to reconsider the matter. *See, e.g., SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).[7]

### Conclusion

The Florida Commission's adoption of the TSLRIC pricing methodology, and its approval of statewide averaged rates for local loops on a transitional basis, were consistent with the Telecommunications Act of 1996 and were not arbitrary or capricious. The Florida Commission's failure to exclude the avoided cost of operator services from wholesale rates for local service was inconsistent with the Act. The Florida Commission must further explain or consider its decision with respect to the per-message charge for local switching, continuing effects of averaged rates for local loops, and combining of network elements. Accordingly,

IT IS ORDERED:

The clerk shall enter judgment stating, "The Florida Public Service Commission's Final Order on Arbitration, as amended, is affirmed with respect to its overall pricing methodology and adoption of statewide av-

eraged rates for local loops on a transitional basis; declared invalid with respect to the failure to exclude the avoided cost of operator services from wholesale rates for local service; and vacated for further explanation or consideration with respect to the per-message charge for local switching, continuing effects of averaged rates for local loops, and combining of network elements, all as set forth in the Order on Merits entered September 28, 2000. Defendant Commissioners of the Florida Public Service Commission shall conduct further proceedings consistent with the Court's Order on Merits and this judgment." The clerk shall close the file.

---

7. In further considering this matter, the Florida Commission will be bound by 47 C.F.R. § 51.315(b), which prevents an incumbent that is providing network elements to a competitor from separating any such network elements that the incumbent currently combines. In *Iowa Utilities,* the Supreme Court upheld that rule. *See Iowa Utilities,* 525 U.S. at 394, 119 S.Ct. 721. The Supreme Court also not-

ed that the arguments on that issue in that case might be "academic" in light of the Court's simultaneous invalidation of the FCC's "necessary" and "impair" rule. *See Iowa Utilities,* 525 U.S. at 392, 119 S.Ct. 721. Nothing in this order forecloses the Florida Commission from taking otherwise proper action in response to the Supreme Court's decision on the "necessary" and "impair" rule.